# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>        v.<br><br>DAVID WILLS,<br><br>Defendant. | Criminal Action No:<br>2:17-CR-390 |

<u>Sentencing memorandum</u>

**TO THE HONORABLE NELVA GONZALES RAMOS, UNITED STATES DISTRICT JUDGE FOR THE SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION:**

The Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." *See* Terry Carter, *Rakoff's on the SEC draws fire, praise—and change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53. That fundamental flaw is exacerbated in Mr. Wills' case because Wills is a complex man who still bears the scars of his troubled upbringing. Wills stands before the Court for sentencing, and the draconian sentencing guidelines call for a life sentence. A life sentence would be an excessive and inflammatory reaction rather than an individualized sentence that is sufficient but not greater than necessary.

Undersigned counsel would note that even if the Court sentenced Wills to the mandatory minimum sentence—15 years—that is essentially a life sentence for Mr. Wills, who is 67 years old with various health problems. According to the Social

Security Administration ("SSA"),[1] a 67-year-old male will live an additional 16.47 years. This does not, however, consider Wills' susceptibility to the coronavirus. Wills is at heightened risk to contract the deadly virus because of his advanced age and his chronic asthma. As the Court is keenly aware, the Bureau of Prison (hereinafter "BOP") has been ravaged by the coronavirus. The coronavirus pandemic posed such an unprecedented threat to the prison population that the Attorney General of the United States ("AG") proposed release criteria for inmates. Additionally, the AG testified before the House Judiciary Committee on July 28, 2020 and stated that it was against the Department of Justice's policy to seek high sentences for older defendants.[2]  Hundreds of inmates have been furloughed and returned to their communities to serve the remainder of their sentences.

Wills submits this sentencing memorandum to aid the Court in determining an appropriate sentence under 18 U.S.C. § 3553(a).

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purpose of sentencing set forth in the second paragraph of the statute. In undertaking its analysis, the Court considers the advisory sentencing range recommended by the Guidelines and any relevant Guideline policy statements, as well as other traditional sentencing factors, such as:

(1) The nature of the offense and history and characteristics of the defendant;

---

[1] *See* SSA Actuarial Life Table, https://www.ssa.gov/oact/STATS/table4c6.html
[2] *See* AG Barr testimony before House Judiciary Committee on July 28, 2020; *See also* *https://www.cbsnews.com/live-updates/william-barr-house-judiciary-committee-testimony-contentious/*

(2) The purpose of sentencing;

(3) The kinds of sentences available;

(4) The Sentencing Guidelines;

(5) Pertinent policy statements issued by the Sentencing Commission;

(6) The need to avoid unwarranted disparities among similar offenders; and

(7) The need to provide restitution to victims.

18 U.S.C. § 3553(a).

Nearly 20 years after the Supreme Court's decision in *U.S. v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *U.S. v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are no longer "the only consideration" at sentencing. *Gall v. U.S.*, 552 U.S. 38, 49 (2007). Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Id.* The Court is to impose its sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id.* The Court need *not* find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47.

Wills' Family History

The Court presided over Wills' trial and is aware of the nature of the offense. Wills was born out of wedlock to Roy and Shirley Wills. At eight months old, Wills was sent to live with his grandmother, Pearl. Wills' parents eventually married when Wills was two or three years old. Shortly, thereafter, Wills lived with his parents from

age four to around age twelve. Wills has two sisters and one brother, all from his parents' union. Wills is the oldest of Roy and Shirley's children.

Wills' upbringing was tumultuous. Wills experienced physical violence by his father's hands. The physical violence culminated with Wills' jaw being broken when he was fourteen years old. Wills was not the only target of his father's rage. Wills would often times witness his mother being beaten by his father. The beatings would occur with sticks and oftentimes Roy's fists. On other occasions, Wills' father would threaten to kill his mother with a shotgun in hand. Wills would attempt to protect his mother to his own detriment. The chaos in Wills' upbringing had a toll on him at a young age. The emotional, physical, and mental toll of his father was felt by those around him. Around age fourteen or fifteen, Wills' father's farm hand, Marshall, committed suicide by shooting himself in the head. Wills found the body. It was a traumatic event for him.

Wills' father died from cirrhosis at the age of forty-six. Wills' father was a habitual smoker, he often consumed four packs of unfiltered cigarettes per day. To exacerbate matters, Wills' mother had an immense psychiatric history of bipolar disorder. She was committed to psychiatric units throughout Wills' young life and she had severe mood swings. Wills' mother was an arson murder victim at the age of fifty-nine around 1990.

Prior to his parents' untimely deaths, Wills' parents divorced. The family court decided that Wills and his brother would remain with their father and that his sisters

would go live with their mother. After his parents' separation, Wills rarely saw his sister and mother because they lived two and half hours away.

Wills left the home around age sixteen because of the physical violence he experienced at the hands of his father. Wills was essentially on his own from the age of sixteen, but, occasionally, he would seek refuge at his grandmother's home. The confusing sequence of Wills' living, and caregiving situation highlights his family's dysfunction.

Although, Wills' relationship with his parents was tumultuous, Wills did have a positive relationship with his uncle Joe. Wills and uncle Joe would often times hunt snakes in Montgomery County, Maryland around little Seneca lake. *See* Exhibit 1. Wills at the time of the hunts was deathly afraid of snakes, but with his uncle's reassurance and care Wills was able to go snake hunting fifty or sixty times. Hunts would begin the same way every time. Wills and his uncle would arrive at grandma Pearl's house. His uncle would provide the only necessary equipment, a burlap bag. Wills and uncle Joe would wade through muddy creek water looking for the creatures that fascinated uncle Joe to no end. Uncle Joe typically would grab snakes from the muddy water and toss them to Wills to put in the burlap bag. Uncle Joe had a policy of never keeping a snake for more than a couple hours.  However, on rare occasions Joe would take the snakes home and release the snake into grandma Pearl's house. This would often times cause quite the commotion. Wills learned several things from those snake hunts. The most important thing he learned was that it is OK to catch snakes and it was OK play pranks on folks, but you never hurt the snake.

Wills and uncle Joe would shoot arrows together, but not in the traditional archery manner i.e. at targets. Instead, Wills and his uncle would sit side by side in grandma Pearl's backyard. Uncle Joe would shoot arrows into the air as straight up as he could. The goal of the game was to see how close the arrows would hit the ground near you as the arrows returned to earth. One-time uncle Joe was hit on the side of the head with one of the blunt tip arrows.

Wills' lifelong employment history

Wills has consistently maintained employment throughout his life. Wills worked at different national state humane societies, Hewlett-Packard and General Mills. Wills ran humane societies from 1977 to 1988 initially in New Hampshire and then Detroit. From 1980 to 1988, he worked at the Michigan Humane Society. Because of his good work with the Michigan Humane Society, Wills became the head of the international investigations department of the National Humane Society. Wills was essentially a special undercover agent for animals. Wills worked in approximately thirty-one different countries coordinating the first undercover agents investigating pet and animal trades. Wills was diagnosed with Herpes Simplex 1 & 2 during this work in Africa. *See* Exhibit 2. Wills' life mission has been to help and save animals.

Wills is a low risk to recidivate

Wills was rated *via* Static-99R, which is the most widely utilized sex offender instrument in the world. Wills scored a "-2," which is a very low score. When considering the Static-99R Evaluator's Workbook (2016), the Supplementary

Recidivism tables include the observed and estimated five-year sexual recidivism rates for the Static-99R routine sample with scores of -2 include a 1.1% observed recidivism and a 1.3% predicted recidivism rate. § 3553(a)(2)(C)'s mandate to protect the public from further crimes of the defendant relates to the defendant's risk of recidivism and the danger, if any, posed by the defendant. *See United States v. Rosales-Gonzales*, 801 F.3d 1177, 1184 (9th Cir. 2015). Counsel humbly suggests that justice would be achieved by sentencing Wills to a below guidelines sentence because of his low risk to recidivate. Other factors support this conclusion as well.

"Recidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." U.S. Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, p.12 (May 2004). At the time of sentencing Wills will be sixty-seven (67) years old. As an older offender, in the above-fifty-year-old range, Wills has a low risk of recidivating (9.5%) compared to younger offenders, under age 21, which recidivate over one-third of the time (35.5%). *Id.* at 12.

The Sentencing Commission found "...those [offenders] with stable employment in the year prior to their instant offense are less likely to recidivate (19%) than are those who are unemployed (32.4%)." U.S. Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, p.12 (May 2004). Wills has a robust work history. Wills has consistently maintained employment for years. This weighs in favor of a low risk to recidivate.

7

Likewise, the Sentencing Commission found that, "Overall, offenders with less than a high school education are most likely to recidivate (31.4%), followed by offenders with a high school education (19.3%), offenders with some college education (18.0%), and offenders with college degrees (8.8%)." U.S. Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, p.12 (May 2004). Wills has a low chance to recidivate because he has obtained an undergraduate degree from the University of Michigan.

"Overall, offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0%) than those not using illicit drugs (17.4%)." U.S. Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, p.12 (May 2004). Wills does not use illicit drugs and was closely monitored for same *via* pretrial services upward to four and a half years leading to the trial on this matter.

Wills' lack of use of illicit drugs, educational status, employment history, age, and his Static-99R score all suggest that Wills is at low risk to recidivate. Further, a longer sentence poses added health risks to Wills.

A lengthier sentence does not have greater deterrent effect on an offender. Empirical research supports this conclusion.[3] "Imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican presidents reached

---

[3] *See* Blumstein, Cohen, and Nagin, *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates* 1978; Blumstein, Cohen, Roth and Visher, *Criminal Careers and "Career Criminals"* 1986; *Reiss and Roth Understanding and Preventing Violence* 1993.

that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A review of research 28-29 (2006).

This Court should focus on specific deterrence to Wills and not general deterrence to the public at large when fashioning Wills' sentence. One court described the ills of general deterrence as:

> "General deterrence uses a utilitarian calculation, subjecting defendants to longer periods of incarceration than retribution requires to 'send a message' to other potential offenders. Inherent in this general deterrence calculation is a tension between individual dignity and societal good begging the question: Is it ethical to impose a greater-than necessary punishment upon an individual criminal defendant to protect society at large?"

*United States v. Cole*, 622 F. Supp. 2d 632 (N.D. Ohio 2008).

Recently, the Court granted Defendant's motion to lift his segregation order at the Coastal Bend Detention Center, the Government did not oppose, and Wills was put into general population. Not long after moving his belongings to his cell, we was reading a book on his bunk, when a cellmate came and threatened him, told him to leave immediately, and told him he would not be safe in the Coastal Bend Detention Center or in the Brooks County Detention Center either. The detainee claimed to know what Wills had done and claimed that he would not be there if he were innocent. He has since been placed not only back in segregation, but also on watch every fifteen minutes. This means that he gets no sleep. Mr. Wills is not suicidal, he is in danger of harm from others. In the Brooks County Detention Center he was placed in a multiple man cell with other high risk detainees. His time in the detention facilities has been hard time. And this Court should sentence him in recognition that he is

doing hard time; without access to reasonable communication with outside persons, without visitation from family and friends, with inadequate visitation by telephone, and serving in danger of violence from other detained persons.  Any convicted person's sentence should be imprisonment.  Not the fear of violence or death. In *United States v. Edmonds,* 920 F.3d 1212, 1214 (8th Cir. 2019), the Court downward departed three months for the hard time Edmonds served pending his sentencing. The time Wills has served pending sentencing can only be described as hard time.  He has no recreation, there are no programs for him to participate in, and no training or rehabilitation opportunities are available.   Under these circumstances, it is appropriate for the Court to downward vary for Mr. Wills' service of hard time pending sentencing.  Punishment for a criminal offense should be incarceration, not separation from one family, being denied recreation and personal hygiene, and being denied communication with one's family.   However, the pandemic has created circumstances in which all of the above are visited upon Mr. Wills.  Therefore, he has been serving hard time pending his sentencing.

Wills humbly requests a variance from the guidelines because he is at heighted risk of contracting the novel coronavirus. The health risk to Wills, is heightened because of he is sixty-seven (67) years old and suffers from chronic asthma. The novel coronavirus has infected over 132,300 people, leading to at least 4,954 death worldwide. On March 11, 2020, the World Health Organization officially classified the coronavirus as a pandemic.

As of August 5, 2020, there are currently 1807 positive-testing inmates and currently 531 positive-testing staff. The Bureau of Prisons has 128,375 federal inmates in BOP managed institutions and 13,675 in community-based facilities. However, these numbers most likely underrepresent[4] the threat of the novel coronavirus because there have been 38,632 completed tests. Despite, this low level of testing there have been 10,807 positive tests within the BOP. The inmate death count remains at 108. Sentencing Wills' to an extended period of time raises the likelihood of him contracting the virus and dying.

Section 3553(a) recognizes that the Court should take into account any medical issues facing the defendant and whether the sentence imposed will "provide the defendant … with needed medical care … in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Because BOP is not equipped to handle the challenges of the corona virus undersigned counsel humbly suggests that the Court vary below the advisory guideline range. While the guidelines and the federal sentencing scheme could not have foreseen a pandemic. The guidelines do anticipate Courts providing reduced sentences when there are health issues at play. *See* USSG § 5H1.4.

Will should not be penalized for proceeding to trial

Wills exercised the crown jewel of the American judicial system and elected to have a trial. *See Blakely v. Washington*, 542 U.S. 296, 305-06 (2004) [The right to a jury trial "is no mere procedural formality, but a fundamental reservation of power

---

[4] *U.S. v. Carlos Cuevas*, 2020 WL 4436380, at *5 (D. Md. Aug. 3, 2020) (Hazel, J.) [The Court rejected the idea that a low incidence of positive tests was a reliable indicator of safety. That Court granted Mr. Cuevas' request for a sentence reduction finding that there were extraordinary and compelling reasons to warrant a reduction of sentence in light of the pandemic and preexisting health conditions].

in our constitutional structure." and   "Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary."]; *See also Duncan v. Louisiana*, 391 U.S. 145, 155 (1968) ["A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government.] Wills' decision to take his case to trial should be not considered when determining his sentence.

Request to be designated near Stephen White

As the Court is aware, Wills' wife Lori succumbed to her battle with cancer. Wills' stepson Stephen White testified during the trial and explained how Wills he considers Wills to be his father, affectionally calling Wills "Pops." White summarizes the relationship as follows:

> "On that first meeting, I found David to be a genuine person, caring, loving, giving, and fiercely passionate about animal and human rights. It was heart and compassion which won both my Mom and myself over some 25 years ago. Soon after, my Mom and Pop's [sic] were married. This was the first time I had a Father in my life and David took the responsibility of caring for a son and wife and raised me as his son. He took this responsibility on with great success and love and caring."

*See* Exhibit 3.

Will respectfully requests that he be designated to FCI Cumberland so that Wills can maintain his relationship with his son Stephen. If FCI Cumberland is not available then Wills humbly requests that he be designated to FCI Petersburg in Hopewell, VA or FCI Beckley in Beaver, WV.

An obstruction of justice adjustment is not applicable to the jury's verdict

§3C1.1. Cmt. 7 provides, "If the defendant is convicted of an offense covered by…§2J1.2 (Obstruction of Justice)…this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself." Thus, because the jury convicted Wills of obstruction, an additional adjustment for perjury, if the Court found same to be material, would not be applicable. The government's alleged claims of perjury were not submitted to the jury. The jury returned a general verdict. Further, the alleged claims of perjury were not material.

Dr. Adams' evaluation is not ethical or a proper forensic evaluation

Dr. Adams appears to be Jane Doe's treating psychiatrist. Dr. Adams has prepared an alleged forensic exam of Doe, where he recommends that Doe will need treatment for twenty years to deal with her PTSD. However, it is unethical for a treating physician to prepare a forensic exam. *See* Exhibit 4, *Irreconcilable Conflict Between Therapeutic and Forensic Roles*. This is because the two roles—treating psychiatrist and the forensic psychiatrist—are different. *Id.* at 50. A treating psychiatrist works to help the patient improve and is not skeptical or discerning. *Id.* A forensic exam is more objective. Thus, here where Doe was given a "forensic" exam by here treating psychiatrist the results are invalid because the exam was not objective. There is no empirical data to support Dr. Adams' findings. Dr. Adams proposed course of treatment of twenty years is unreasonable, in light of the fact that, the normal course of treatment for PTSD is eight to twelve sessions.  Doe on page 281

13

of the CPS records, which the court has reviewed stated that she was no longer attending counseling as she did not feel like going anymore.

Conclusion

The Supreme Court's decisions in *Gall*, *Cunningham*, and *Kimbrough v. U.S.*, 552 U.S. 85 (2007), significantly broadened the discretion of courts to impose less stringent sentence than the one suggested by the Guidelines, and in this case the Court should exercise its broad discretion and impose a sentence substantially below the advisory guidelines range because of Wills' health status, the hard time he is serving and will serve, and his low risk to recidivate.

Respectfully Submitted,
By: _/s/_

CYNTHIA E. ORR*
Bar No. 15313350
GERALD H. GOLDSTEIN
Bar No. 08101000
ABASI D. MAJOR
Bar No. 24096504
JOHN S. GILMORE, III
Bar No. 24096676
DESTINEE GESING
Bar No. 24096406
GOLDSTEIN, GOLDSTEIN, HILLEY & ORR
310 S St. Mary's St.,
29th Floor Tower Life Bldg.
San Antonio, Texas 78205
210-226-1463 phone
210-226-8367 facsimile

JOHN S. GILMORE
Bar No. 07958500
622 South Tancahua
Corpus Christi, Texas 78401
361-882-4378

361-882-3635 facsimile

RENE RODRIGUEZ
Bar No. 17148400
433 S. Tancahua St.
Corpus Christi, Texas 78401
Email: rene.rodriguez@rdrlaw.com
361-815-3888
361-882-1919 facsimile

TERRY W. SHAMSIE
Bar No. 18089800
LAW OFFICE OF TERRY W. SHAMSIE
4002 Castle Valley Dr.
Corpus Christi, Texas 78410
361-960-6300
Email: terryshamsie@hotmail.com

Attorneys for Defendant,
DAVID KEITH WILLS

*Lead Counsel

## CERTIFICATE OF SERVICE

This is to certify that on this the 16th day of September, 2020, a true and correct copy of the above and foregoing document was served on Zara Fenelon, Assistant United States Attorney *via* electronic copy.

By:___/s/_____